# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2615

_____

United States of America,                           *
                                                    *
        Plaintiff – Appellee,                *
                                                    *   Appeal from the United States
    v.                                       *   District Court for the
                                                    *   District of Minnesota.
Jerry Geraldo Garcia,                               *
                                                    *
        Defendant – Appellant.               *

_____

Submitted: March 11, 2008
Filed: April 7, 2008

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

BYE, Circuit Judge.

A jury found Jerry Garcia guilty of one count of conspiracy to distribute, and one count of aiding and abetting the distribution of, in excess of fifty grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. The district court[1] sentenced him to the minimum sentence prescribed by statute, 120 months imprisonment. Garcia appeals, arguing there was insufficient evidence to support the verdict and challenging his sentence as an unconstitutional violation of the Eighth Amendment. We affirm.

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

I

Consistent with our standard of review, the following facts are described in the light most favorable to the verdict. United States v. Honarvar, 477 F.3d 999, 1000 (8th Cir. 2007). James Ripley, whom police arrested in June 2006 for dealing drugs, began cooperating with the Minnesota Bureau of Criminal Apprehension as a confidential informant. Ripley assisted the Bureau in apprehending Ripley's supplier, Ricardo Bassat, and in identifying Bassat's source of supply.

Ripley arranged a controlled buy from Bassat of a full pound of methamphetamine. Bassat agreed to the sale, and informed Ripley his source would be involved in the transaction because the source would not give Bassat such a large quantity of drugs on credit. Further, Bassat required Ripley to pay the entire purchase price, $13,500, at the time of the transaction. Ripley agreed to Bassat's terms and the two planned to meet again at Bassat's house in three days to complete the deal. Law enforcement set up undercover video surveillance outside of Bassat's house and fitted Ripley with a wire.

Before the scheduled meeting, law enforcement officers observed a person in a white Lexus[2] slowly drive past Bassat's house. Later, Garcia and co-defendant Roberto Alicea arrived together at Bassat's house in a grey SUV. When Ripley arrived, he parked in the rear of the driveway. Ripley, Bassat, and Alicea talked for a short time in Bassat's garage. During the course of their conversation, Bassat indicated he was waiting for someone to arrive with the methamphetamine. Garcia was not present during this conversation, and Ripley had not yet seen Garcia that day.

In the meantime, Garcia waited on the front steps of the house. Shortly after

---

[2]Law enforcement later identified the car as Garcia's.

Ripley's arrival, Garcia received a phone call from Alicea, signaling to him to retrieve the drugs. Garcia looked at the phone and, without answering the call, walked away from the house. Alicea replaced Garcia as the lookout at the front of Bassat's house, but later went inside and met Ripley and Bassat in the attic.

Garcia arrived in his white Lexus, the same car previously observed driving past the Bassat residence, and parked in the driveway directly behind Ripley's truck, blocking Ripley's exit. He retrieved the pound of methamphetamine, which was contained in a plastic grocery bag, from inside his car and brought it to the attic. There, Garcia handed the drugs to Bassat, who handed the drugs to Ripley.

Ripley left the house as quickly as possible after he obtained the methamphetamine. He retrieved the buy funds from his truck and met Bassat in the garage, where Bassat counted the money to verify it was the entire purchase price. While Ripley paid for the drugs, Garcia stood in the driveway behind his Lexus, with the trunk open. According to the government, Garcia was waiting until Ripley made full payment before allowing Ripley to drive away. While Garcia waited, he did not put anything in or take anything out of his trunk. He just stood there. After Bassat counted the money, Garcia backed his Lexus out of the driveway and allowed Ripley to leave. As Ripley drove away, he telephoned Special Agent Castilleja to inform him "the guy in the white car" delivered the methamphetamine.

While Ripley drove a safe distance from the house to rendezvous with Special Agent Castilleja, Garcia circled the neighborhood. According to the government, Garcia was conducting surveillance as he had done before the meet. When Garcia returned to Bassat's house a short time later, he parked on the street in front of the house – not in the driveway. Thereafter, the SWAT team arrived, placed everyone under arrest, and assisted in the execution of the search warrant.

Alicea and Bassat pleaded guilty to one count of aiding and abetting distribution in excess of fifty grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2. Garcia pleaded not guilty to one count of conspiracy to distribute, and one count of aiding and abetting distribution of, in excess of fifty grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. After a four day trial, a jury convicted Garcia on both counts. The district court sentenced Garcia to 120 months imprisonment, the minimum prescribed by 21 U.S.C. § 841(b)(1)(A). This appeal followed.

II

Garcia argues there was insufficient evidence to support the jury verdict because the government did not prove Garcia had actual knowledge he was transporting methamphetamine or was otherwise aiding the unlawful sale of narcotics. Garcia contends there is no evidence he knew what was contained in the package, since no conversation about the drug deal occurred in his presence. Garcia argues no reasonable jury could have concluded he was a knowing participant in the conspiracy to distribute methamphetamine based on his mere constructive possession of the drugs. In response, the government maintains the totality of Garcia's behavior, as presented by the video, audio and testimonial evidence, is more than sufficient to show Garcia was a knowing co-conspirator.

Under Rule 29(a), a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. We review the sufficiency of the evidence supporting a conviction de novo, viewing evidence in the light most favorable to the government and accepting all reasonable inferences in favor of the jury's verdict. United States v. Beck, 496 F.3d 876, 878 (8th Cir. 2007). "The standard of review is very strict, and we will reverse a conviction only if we conclude that no reasonable jury could have found the accused guilty beyond a reasonable doubt." Id. at 879 (internal citation omitted).

The district court instructed the jury about knowledge being a critical element of the crimes charged against Garcia.  See, e.g., Final Jury Instructions 16, 21-26, 28, 30, 32 (January 11, 2007).  "Knowledge may be proven by circumstantial evidence alone; it frequently cannot be proven in any other way."  United States v. Erdman, 953 F.2d 387, 390 (8th Cir. 1992).  Garcia's actions, presented by evidence at trial, suggest he: conducted counter-surveillance in his Lexus both before and after the transaction; served as a look-out in front of Bassat's house; secured the drugs in his car off-site until his co-conspirators gave him the signal it was safe to deliver them; delivered the drugs to Bassat's attic where they were handed off to Ripley; and blocked Ripley's exit until his co-conspirators verified they had received payment in full. From this evidence, it was not unreasonable for the jury to have inferred knowledge and guilt beyond a reasonable doubt.  United States v. Bissonette, 586 F.2d 73, 77 (8th Cir. 1978).  We conclude the evidence was sufficient to support the verdict.

III

Garcia also appeals his sentence.  He argues it constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the Constitution, to sentence him to a mandatory minimum term of imprisonment based on factors over which he had no control and of which he had no knowledge, namely, the purity and quantity of drugs transacted.

The question of whether a statute is constitutional is a question of law, which we review de novo.  United States v. Prior, 107 F.3d 654, 658 (8th Cir. 1997).  We have repeatedly held mandatory minimum penalties for drug offenses do not violate the Eighth Amendment's prohibition of cruel and unusual punishments.  See, e.g., United States v. Baker, 415 F.3d 880, 882 (8th Cir. 2005); United States v. Collins, 340 F.3d 672, 679 (8th Cir. 2003) (stating Eighth Amendment forbids only extreme sentences which are grossly disproportionate to crime; holding mandatory minimum

penalty of life imprisonment for a drug offense did not violate the Eighth Amendment); Prior, 107 F.3d at 660 (holding mandatory life sentence after three prior drug convictions did not violate the Eighth Amendment); United States v. Mendoza, 876 F.2d 639, 641 (8th Cir. 1989) (holding a mandatory minimum sentence based on the quantity and purity of drugs did not violate the right to be free from cruel and unusual punishment).  Garcia argues his case is distinguishable because he did not have any knowledge of the quantity or the purity of the drugs, and thus no criminal intent with regard to those factors.  He urges us to hold the mandatory sentence of ten years imprisonment is grossly disproportionate to his crime and, thus, unconstitutional.

Garcia's argument depends on the same assertions as his sufficiency of the evidence challenge, and likewise fails.  Baker, 415 F.3d at 882.  A jury found Garcia possessed the requisite criminal intent and knowledge to be guilty of conspiracy to distribute, and aiding and abetting in the distribution of, over fifty grams of methamphetamine.  Because he was properly convicted under 21 U.S.C. § 841(a)(1) and (b)(1)(A), Garcia necessarily had the criminal intent required by the statute, and is therefore fairly subject to its prescribed minimum punishment.  See Chapman v. United States, 500 U.S. 453, 467 (1991) (noting "Congress has the power to define criminal punishments without giving the courts any sentencing discretion.")  Garcia's argument about his having no control over the extent of his wrongdoing is unavailing.

Furthermore, the ten-year mandatory minimum sentence imposed on Garcia fell within the advisory sentencing guidelines range of 108 to 135 months, properly calculated by the United States Probation Office in its Presentence Investigation Report.  This sentencing range incorporated the mitigating factors, which Garcia now contends preclude the application of the mandatory minimum sentence to him.[3]  Thus,

---

[3]Specifically, the PSR recommended a decrease to Garcia's offense level by five levels,  from a base of 34 to a total offense level of 29.  The PSR recommended reducing Garcia's base offense level by three levels to reflect his minor role in the

for the additional reason that "it is rare for a term of years within the authorized statutory range to violate the Eighth Amendment," we find no basis to conclude Garcia's sentence amounted to cruel and unusual punishment. See United States v. Weis, 487 F.3d 1148, 1154 (8th Cir. 2007) (citing Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in judgment) (noting the infrequency of successful Eighth Amendment challenges to non-capital sentences)).

For the foregoing reasons, we affirm Garcia's sentence.

IV

Accordingly, we affirm the judgment of the district court.

_____

conspiracy, U.S.S.G. §2D1.1(a)(3)(ii), and by an additional two levels for being a minor participant, U.S.S.G. §3B1.2(b). Prior to sentencing, Garcia argued he was entitled to a four level downward adjustment under §3B1.2(a) for being a "minimal" participant rather than the two level reduction for being a "minor" participant under §3B1.2(b).