# United States Court of Appeals
## For the First Circuit

Nos. 09-1158
     09-1159

UNITED STATES OF AMERICA,

Appellee,

v.

BRAULIO AGOSTO-VEGA,
BRAULIO AGOSTO MOTORS, INC.,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

---

Before
Torruella, Lipez, and Howard,
Circuit Judges.

---

Martin G. Weinberg, with whom Francisco Rebollo-Casalduc, were on brief for appellant Agosto-Vega.
Kimberly Homan, for appellant Braulio Agosto Motors, Inc.
Lisa E. Jones, Attorney, Department of Justice, Environment & Natural Resources Division, with whom John C. Cruden, Acting Assistant Attorney General, Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Thomas F. Klumper, Desireé Laborde-Sanfiorenzo, Assistant United States Attorneys, Michael R. Fisher, United States Environmental Protection Agency, Silvia Carreño, Office of the Regional Counsel, were on brief for appellee.

---

August 18, 2010

---

**TORRUELLA**, **Circuit Judge**.  This is a consolidated appeal from a jury verdict which found Appellants Braulio Agosto-Vega (Agosto) and Braulio Agosto Motors, Inc. (Agosto Motors) guilty of violating criminal provisions of the Clean Water Act (CWA), 33 U.S.C. §§ 1251 et seq.

The principal issue presented is whether Appellants were deprived of their constitutional right to a public trial pursuant to the Sixth Amendment.  As will be explained more fully, we find that the District Court committed a structural error by excluding the public from the courtroom during the selection of the jury. See Presley v. Georgia, __ U.S. __, 130 S. Ct. 721 (Jan. 19, 2010) (per curiam).  We are thus required to vacate Appellants' convictions and remand their cases for a new trial.

Nevertheless, considering that Appellants will have a new trial on the same charges, to prevent an allegation that they will be subjected to double jeopardy in violation of the Fifth Amendment by reason of this retrial, it is incumbent upon us to address Appellants' contentions that the government failed to present sufficient evidence at the first trial to allow the jury to conclude that they were guilty beyond a reasonable doubt of the charges presented against them.  See United States v. Mélendez-Rivas, 566 F.3d 41, 43 (1st Cir. 2009).  We conclude that the government proved the charges against Appellants by sufficient evidence to establish their guilt beyond a reasonable doubt.

-2-

## I.  **Factual background and procedural synopsis**[1]

Agosto was the owner and principal officer of Agosto Motors, an automobile dealership in San Juan, Puerto Rico, as well as of another closely-held family corporation, Mansiones de Hacienda Jiménez, Inc. (Mansiones), a real estate development company which he used to develop a housing project in Río Grande, Puerto Rico called Mansiones de Hacienda Jiménez (the development, or the project).  Both companies were run out of the same office, and had as officers various members of the Agosto family.

The development began selling units in 2003, with the first purchasers moving into their residences in the summer of 2004.  Almost immediately, several of the new homeowners began to experience frequent overflows of raw sewage from the septic tanks located in front of their houses.  These tanks would become completely full, often in a matter of days, and raw sewage would routinely overflow into the front yards, onto the sidewalks, and into streets, where it would then drain into the storm sewers.  Raw sewage would also bubble up inside the homes through the toilets, the bath tubs, and the sink drains.  As would be expected, the septic tank issue became contentious and was the subject of numerous meetings, telephone calls, and correspondence between the

_____

[1]   We recite the facts relevant to Appellants' claim of insufficient evidence "in the light most favorable to the jury's verdict." United States v. Troy, 583 F.3d 20, 22 (1st Cir. 2009).

-3-

homeowners individually, the Homeowners Association, and Agosto, his representatives, and his lawyers.

Although at first Agosto paid reputable companies to dispose of the waste, he soon turned to Mansiones employees. They would use a hose to suction the raw sewage from the septic tanks and either discharge the wastewater directly into storm drains that emptied directly into Jiménez Creek (the Creek) through an underground pipe, or into a large tank truck registered to Agosto Motors, which would then be emptied into the storm drains, onto land adjacent to the Creek's basin, or into the Creek itself. The Creek is a tributary of the Espíritu Santo River, a major river on the northeastern coast of Puerto Rico, in the Municipality of Río Grande, which empties into the Atlantic Ocean.

In March and April of 2005, after receiving multiple complaints, the Puerto Rico Environmental Quality Board (EQB) and the U.S. Environmental Protection Agency (EPA) investigated the allegations regarding the discharges into the Creek, which was classified as an "SD" fluvial resource, indicating that it was suitable for drinking and recreational use. The investigation revealed that thousands of gallons of raw sewage had been discharged into the Creek. These discharges caused the water in the Creek, at times, to turn black and reek of sewage.

On May 11, 2005, Agosto and Agosto's brother Juan[2] were indicted by a federal grand jury and charged with engaging in a conspiracy to violate the CWA (Count One), as well as three counts of aiding and abetting in the unlawful discharge of raw sewage from a point source into waters of the United States, namely the Creek (Counts Two through Four). See 33 U.S.C. §§ 1311 and 1319(c)(2)(A). Agosto Motors was charged with two of the three counts of aiding and abetting alleged in the indictment.

The trial began on June 18, 2008. When jury selection was about to commence, counsel for Agosto called the attention of the district judge to the fact that the court's security officers were refusing to allow members of the Agosto family into the courtroom during jury selection. The judge responded that there was no room for them or anyone not a member of the venire because "the benches are full of jurors." The court indicated that her regular courtroom was under repair thus necessitating the use of the smaller facility, which was the only courtroom available at the time. Defense counsel suggested that the jury box be used to seat jurors, thus opening seating in the courtroom benches for the Agosto family members, a suggestion rejected by the district judge, who indicated that she wanted to keep all the jurors together. The court expressed concern regarding "family members touching potential jurors while the selection of the jury is going on." The

---

[2] Juan pleaded guilty prior to the trial.

court maintained its view that there was not enough room for the family members at that time, and that jury empanelment was not part of the process in which it particularly mattered whether Agosto's relatives were present. It stated: "[l]isten, this is selection of the jury. There is no evidence. There is no argument. This isn't something that if relatives aren't there . . . [sic]." Over the objections of Agosto's lawyer, the court closed the courtroom, and no one was allowed into the courtroom during the entire jury selection process. Neither defense counsel, nor the court, nor government counsel suggested that the Agosto family members be permitted to enter as room became available during the proceedings, i.e., as potential jurors were dismissed.

After selection was completed and the jury sworn, defense counsel stated for the record that Agosto's family had spent the entire day outside the courtroom waiting to come into the trial but had never been allowed into the courtroom. This was so, notwithstanding that in addition to the jury box there had also been available three empty benches in the well of the courtroom in which jurors could have been seated, thus making room for the Agosto relatives to sit in that section of the courtroom during the jury selection. The district judge indicated that it was not her practice to allow the well to be used for the purpose indicated by counsel, and again stated that space constraints had required the public's exclusion, while faulting defense counsel for failing to

ask the court again to admit the family members after some of the prospective jurors had been excused. Agosto's counsel then stated that he knew "for a fact" that a courtroom security officer had prevented a member of the press from entering the courtroom during the jury selection process at a point when there were seats available by reason of jurors being excused. This assertion was not refuted in any manner by counsel for the government, but the court indicated that it did not consider counsel's assertion to be an established fact. After a sixteen-day trial, which lasted intermittently through July 24, 2008, Agosto and Agosto Motors were convicted on all counts.

In this appeal, Appellants contend that their convictions should be vacated, and their case remanded for a new trial, because their Sixth Amendment rights were violated when the district court excluded the public from the courtroom during jury selection. They also challenge the sufficiency of the evidence supporting their convictions, claiming that the government failed to prove beyond a reasonable doubt (1) that they had knowledge of the illegal discharges, and (2) that the creek into which the pollutants were dumped constitutes "navigable waters of the United States" within the meaning of the CWA. Both challenges reference essential elements of the crimes charged. Additional claims of error need not be decided as they are not relevant considering our ultimate ruling on this appeal.

## II. Discussion

### A. The Sixth Amendment right to a public trial

We are informed on this issue by the Supreme Court's recent decision in Presley, 130 S. Ct. 721, as well as by our own circuit precedents, particularly Owens v. United States, 483 F.3d 48 (1st Cir. 2007). Presley was not decided until after Appellants were convicted, but Owens dates back to the year before the present trial. We begin with the facts of Presley for reasons which will become obvious.

At the commencement of Presley's case, and shortly before jury selection was about to start, the trial judge excluded Presley's uncle from the courtroom, who at the time was the only member of the public present for the proceedings. The judge told the uncle he was welcome to come back after jury selection was completed, but "[could not] sit out in the audience with the jurors." Presley, 130 S. Ct. at 722. Presley's lawyer objected to "the exclusion of the public from the courtroom," but the court explained, "[t]here just isn't space for them to sit in the audience." Id. To counsel's insistence that "some accommodation" be reached, the court responded that "the uncle can certainly come back in once the trial starts. There's no, really no real need for the uncle to be present during jury selection . . . ." Id. The court went on to point out that the seats in the audience would be occupied by the jurors and "[Presley's] uncle cannot sit and

-8-

intermingle with members of the jury panel." Id. The court restated that the uncle would be allowed back once the trial started.

Presley was convicted, and in post-trial motions he moved for a new trial based on the exclusion of the public during the voir dire. In the course of the hearing on the motion, Presley presented evidence to the effect that fourteen of the prospective jurors could have been seated in the jury box and the remaining twenty-eight could have fit entirely on one side of the courtroom, leaving adequate room for the public. Nevertheless, the court was not convinced, and the motion for new trial was denied, with the court commenting that "it preferred to sit jurors throughout the entirety of the courtroom." Id. Georgia's appellate court found no abuse of discretion by the trial judge, and the state supreme court affirmed this conclusion, ruling that "Presley was obliged to present the court with any alternatives that he wished the court to consider;" in the absence of which "there [was] no abuse of discretion in the court's failure to sua sponte advance its own alternatives." Presley v. State, 674 S.E.2d 909, 912 (Ga. 2009).

The United States Supreme Court reversed the Georgia courts. In so doing, the Court was pristinely clear that the Sixth Amendment right to a public trial extends to the jury voir dire process. Presley, 130 S. Ct. at 724. Furthermore, the Court emphasized that although the right to a public trial is not

absolute, and "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information," "[s]uch circumstances will be rare . . . and the balance of interests must be struck with special care." Id. at 724 (quoting Waller v. Georgia, 467 U.S. 39, 45 (1984)). The Court, citing to the standards announced in Waller, then explained that "before excluding the public from any stage of a criminal trial," id. (emphasis added):

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,
>
> [2] the closure must be no broader than necessary to protect that interest,
>
> [3] the trial court must consider reasonable alternatives to closing the proceedings, and
>
> [4] it must make findings adequate to support the closure.

Id. (citing 467 U.S. at 48). In Owens, we similarly stressed that "closure may be justified only by 'an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest,'" and held that "a court must consider (and reject) alternatives to closure before barring public access." 483 F.3d at 61-62 (emphasis added, internal citations omitted).

Expounding further on this Sixth Amendment right, the Presley Court explained that "'[t]he process of juror selection is

-10-

itself a matter of importance, not simply to the adversaries but to the criminal justice system.  The public has a right to be present whether or not any party has asserted the right.'"  Presley, 130 S. Ct. at 724-25 (quoting Press-Enterprise Co. v. Superior Court of Cal., 464 U.S. 501, 505 (1984)(holding that press has First Amendment right to free access to a public trial, including during voir dire)).  The Presley court went on to describe the nature of the trial court's duty in this respect, in language particularly apropos to the concerns expressed by the district judge in the present case:

> Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials. . . . Without knowing the precise circumstances, some possibilities include reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members.
>      . . . The generic risk of jurors overhearing prejudicial remarks, unsubstantiated by any specific threat or incident, is inherent whenever members of the public are present during the selection of jurors.  If broad concerns of this sort were sufficient to override a defendant's constitutional right to a public trial, a court could exclude the public from jury selection almost as a matter of course.

Id. at 725.

**Presley Applied**

At the outset we acknowledge, and in fact commend, the district judge in the present case for her actions in trying to

-11-

insulate the jury from improper influences.  For striving to achieve this goal we certainly cannot fault the trial court. However, as is apparent from a reading of <u>Presley</u>, there are higher constitutional values which cannot be overlooked absent exceptional circumstances, conditions which are not presented by the facts of this appeal.  We are constrained to say, however, that we are somewhat taken aback by the government's silence in failing to come to the court's aid during the course of this incident, which ended with the total barring of the public from the jury's voir dire. The government's intervention in suggesting alternatives to this extreme outcome might very well have saved us all the need for repeating this exercise.

As can be seen by our recitation of the facts in <u>Presley</u> and in this case, both proceedings are strikingly similar in content: (1) they both involve criminal trials, thus making the public trial requirement of the Sixth Amendment de rigueur; (2) they both involve the total exclusion of members of the public (actually members of the defendant's family) from the jury voir dire process; (3) in both cases the trial court, following its usual trial management procedures, wanted to keep the jury panel within its physical control inside the courtroom's limited space; (4) in both cases the trial court was concerned with the defendant's family members "intermingl[ing]" (i.e., being "elbow to elbow") with prospective jurors, because of their perceived close

proximity to the jurors in the crowded courtroom; (5) in both cases the trial court stated that there was no room for the public in the audience area of the courtroom; (6) in both cases the trial judge indicated that there was no need for the defendant's relatives to be present during the voir dire; (7) in both cases the trial court stated that the public would be allowed into the courtroom once the trial started; and (8) in both cases the trial court was not proactive in seeking alternative solutions to totally barring the public during voir dire.

There is at least one other important fact in the present case which reinforces Appellants' claims of error when compared to the circumstances of Presley: as Agosto's counsel pointed out to the trial judge, there was space available in the courtroom, which with appropriate flexibility by the district court would have allowed some members of the public to be seated during jury selection, while at the same time insulating the jury from contamination by extraneous influences. There were also other options available to the court: it could have seated members of the public as members of the venire were excused, irrespective of whether the request was renewed by counsel for the defense, or it could have admonished the members of the venire and the public against inappropriate conduct, if this concern existed. And of course, if despite such measures it still considered that the

closing was required by the circumstances, it was required to substantiate its actions by specific findings in support thereof.[3]

We need not belabor the point. This case falls far short of meeting the requirements of Presley and Owens for allowing the exclusion of the public from a criminal trial, and thus we must vacate Appellants' convictions and remand the case for a new trial. On these facts, we need not consider whether, as the government contends, there may be circumstances where a courtroom closure is so trivial that it does not require a new trial. Cf. Gibbons v. Savage, 555 F.3d 112, 121 (2d Cir. 2009).

It is appropriate that we add one last observation. We have previously held, in the context of courtroom closures, that the Waller "standard applies to [the exclusion of] family members [just as it applies] to the general public." Owens, 483 F.3d at 62; see Martin v. Bissonette, 118 F.3d 871, 876 (1st Cir. 1997)("[A] trial court need [not] go beyond the already stringent requirements of Waller before removing a defendant's family members from the courtroom."). Therefore, when considering the balance of

---

[3]  For similar reasons, we reject the government's attempt to distinguish Presley on the basis of courtroom size. The government asserts that the courtroom in which Agosto was tried was physically smaller than the courtroom in Presley, and thus could not comfortably seat spectators. However, there is no indication in the facts of Presley that the courtroom in that case could accommodate spectators more easily than the courtroom here. Indeed, in Presley the Supreme Court indicated that the courtroom was large enough to accommodate the public if the judge had seated some of the jury in the jury box. 130 S. Ct. at 232. Agosto made the very same argument in this case.

-14-

factors supporting closure, courts should not minimize the importance of a criminal defendant's interest in the attendance and support of family and friends. To say the least, this support is ineffective in absentia.

**B. The Government proved its case by proof beyond a reasonable doubt**

### Standard of review

Because this matter is before us after jury verdicts of guilty, this court reviews the evidence de novo, considering "all the evidence, direct and circumstantial, in the light most favorable to the prosecution, drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." United States v. Sherman, 551 F.3d 45, 49 (1st Cir. 2008)(internal quotation marks omitted).

### The legal standards - Count One

Count One of the indictment charged Agosto with conspiracy to commit offenses against the United States. See 18 U.S.C. § 371. To prove this crime, the government must establish beyond a reasonable doubt (1) that Agosto entered into "an agreement to commit an unlawful act; (2) [Agosto's] knowledge of the agreement and voluntary participation in it; and (3) an overt act by at least one of the coconspirators in furtherance of the conspiracy." United States v. Vázquez-Botet, 532 F.3d 37, 61 (1st Cir. 2008)(citation omitted). The government must prove that

Agosto had both the intent to agree and the intent to commit the substantive offense, United States v. Muñoz-Franco, 487 F.3d 25, 45 (1st Cir. 2007), namely violating 33 U.S.C. §§ 1311 and 1319(c)(2)(A).

The CWA prohibits the "discharge of any pollutant" without a permit issued pursuant to the National Pollutant Discharge System administered by the EPA or approved state agencies. 33 U.S.C. § 1311(a). The knowing violation of this prohibition is a felony under § 1319(c)(2)(A). The CWA defines the discharge of a pollutant as "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12), and includes as pollutants, "sewage, . . . sewage sludge, . . . [and] biological materials . . . discharged into water." 33 U.S.C. § 1362(6). The term "navigable waters" is defined as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

Agosto's sufficiency challenge is centered, first, on the knowledge requirement and, second, on the contention that there was insufficient evidence to establish that the unauthorized discharges were into "waters of the United States." Agosto further maintains that the government was required to prove beyond reasonable doubt that he knew that the Creek fell within the CWA's definition of that term.

-16-

## Agosto's Knowledge of the Discharges

Agosto claims that there is no direct evidence that he knew of the discharges, that he was ever present when discharges occurred, that anyone ever told him about the discharges, or that he knowingly directed or approved the discharges. Agosto argues that there is no direct evidence of actual knowledge on his part, and that the case against him is entirely circumstantial. However, even assuming arguendo that this contention is correct, it is well-established that "[k]nowledge may be proven by circumstantial evidence alone;" indeed, "it frequently cannot be proven in any other way." United States v. García, 521 F.3d 898, 901 (8th Cir. 2008); see United States v. García-Pastrana, 584 F.3d 351, 377 (1st Cir. 2009)(for purposes of criminal conviction, "knowledge and intent can be proven through circumstantial evidence" (internal quotation marks omitted)); see also United States v. Glover, 814 F.2d 15, 16 (1st Cir. 1987)("The government may prove its case through circumstantial evidence so long as the total evidence, including reasonable inferences, is sufficient to warrant a jury to conclude that the defendant is guilty beyond a reasonable doubt."). There is nothing remarkable in the use of such evidence in this case, and our sole concern is to determine whether the Government has met its constitutional burden in establishing its case by proof beyond a reasonable doubt through competent evidence. We believe it has.

The jury reasonably could have found that Agosto was fully aware of the raw sewage problem at the Mansiones development, and that he knew and understood its severity. There was evidence presented at trial that Agosto visited the development at least several times a week throughout periods when raw sewage routinely overflowed from the septic tanks onto the front lawns, sidewalks and streets of the homes his company had constructed and sold. Furthermore, as an experienced businessman, Agosto was likely cognizant of the fact that he was ultimately responsible for the solution to this intractable nuisance. The jury could have concluded this from the fact that Agosto engaged homeowners directly and through intermediaries and representatives, and attended several meetings and discussions with his legal counsel.

For a time, Agosto was able to provide a legal solution to this situation by paying the municipality or hiring reputable contractors (through his corporations) to remove the sewage from the premises. However, by October 2004, for whatever reason, Agosto stopped using these third parties and instead proceeded to employ his own workers, providing them with an old military truck with a 3000-gallon tank (which was registered to Agosto Motors) for the purpose of suctioning off the raw sewage from the septic tanks and surroundings.

It is not reasonable to think that Agosto had expectations that these polluted liquids would somehow evaporate

from inside the truck's tank. The logical conclusion is that these pollutants would have to be disposed of in some way. A photograph which forms part of the government's case provides part of the answer. It shows the truck dumping sewage into the storm sewers of the project's streets. There was also testimony from several eyewitnesses establishing that the truck dumped raw sewage into these sewers, or into the Creek itself, on numerous occasions. It is uncontested that these sewers empty into the Creek, which in turn flows into the Espíritu Santo River and thereafter into the Atlantic Ocean. See United States v. Ortiz, 427 F.3d 1278, 1281 (10th Cir. 2005) (storm drain that carried flushed chemicals from toilet to the Colorado River was a "point source"). This evidence provides resounding proof of violations of the federal environmental laws.

Since it is undisputed that raw sewage continued to overflow the septic tanks, and because Agosto and his closely-held companies, Agosto Motors and Mansiones, had to continue to remove it to appease the homeowners, and equally important, to be able to continue with the sale of additional homes in the Mansiones development, the jury could have reasonably concluded that the dumping of sewage by the employees not only took place, but that this activity could not have happened without the direction, knowledge and approval of a person who was an active participant in the day-to-day operations of Mansiones and Agosto Motors and was

-19-

their de facto chief executive officer: Agosto. See United States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35, 55 (1st Cir. 1991) (with respect to the knowledge element under the comparable Resource Conservation and Recovery Act, "knowledge may be inferred from circumstantial evidence, including position and responsibility"). Additionally, but critically, as the principal owner of the Mansiones project, Agosto was the person who stood the most to gain economically, and conversely to lose if things went sour and the sewage was not disposed.

One additional piece of damning circumstantial evidence came from Agosto's brother, Juan, who was the person whom Agosto indicated was acting on his behalf in managing the housing project. With respect to the illegal sewage discharges, Juan testified that "the land belonged to [Agosto]" and that Juan was "just following orders."

In light of all this, there was undoubtedly sufficient circumstantial evidence to establish by proof beyond a reasonable doubt: (1) the existence of a conspiracy between Agosto, his brother Juan, and others to dispose of raw sewage into the Creek, without the appropriate permits, (2) that several overt acts were performed by members of the conspiracy in furtherance of its objectives, and (3) that Agosto had knowledge of these illegal actions.

## "Waters of the United States"

That the Creek is a "water of the United States" is a jurisdictional fact that the government must establish.  However, the government is not required to establish that the defendant was aware of the facts connecting the Creek to the regulatory definition of "waters of the United States."  United States v. Cooper, 482 F.3d 658, 668 (4th Cir. 2007)(holding that creek's "status as a 'water of the United States' is simply a jurisdictional fact, the objective truth of which the government must establish but the defendant's knowledge of which it need not prove"); see also United States v. Wilson, 133 F.3d 251, 262 (4th Cir. 1997) (when the government prosecutes a "knowing violation" of the CWA, it "need not prove that the defendant knew his conduct to be illegal"); United States v. Sinskey, 119 F.3d 712, 715-17 (8th Cir. 1997); United States v. Hopkins, 53 F.3d 533, 541 (2d Cir. 1995).

The EPA has promulgated a regulatory definition of the term "waters of the United States" that encompasses, inter alia, "waters susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; [and] [a]ll interstate waters, including interstate wetlands; [and] the tributaries of [such] waters."  40 C.F.R. § 230.3(s). This duly promulgated regulation has the force of law.  Cf.

-21-

Citizens Coal Council v. United States E.P.A., 447 F.3d 879, 891 (6th Cir. 2006) (citing 33 U.S.C. § 1311(a)).

The Supreme Court has recognized that Congress, in enacting the CWA, "evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 133 (1985); see Int'l Paper Co. v. Ouellette, 479 U.S. 481, 486 n.6 (1987)(the term navigable waters "has been construed expansively to cover waters that are not navigable in the traditional sense"); see also Rapanos v. United States, 547 U.S. 715, 730-31 (2006) (plurality opinion); id. at 767-768 (Kennedy, J., concurring in the judgment).

In United States v. Johnson, 467 F.3d 56, 60 (1st Cir. 2006), we held that the United States "may assert jurisdiction over [a particular surface water] if it meets either Justice Kennedy's legal standard" (i.e., the wetlands "possess the requisite nexus" if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable,'" Rapanos, 547 U.S. at 780), or the plurality's view (i.e., "relatively permanent, standing or

-22-

continuously flowing bodies of water," that are connected to traditional navigable waters, as well as wetlands with a continuous surface connection to such bodies of water). Id. at 739-42.

That the Creek was a "water of the United States," as a jurisdictional matter, was established by the Government by proof beyond a reasonable doubt. The land upon which the Mansiones project was developed is located in Río Grande, Puerto Rico on the northern slopes of the Luquillo Mountain Range and in close proximity to the El Yunque National Forest (the only recognized tropical rain forest in the United States), an area of copious precipitation. In fact, the Creek originates in the rain forest approximately two miles away and is a tributary of the Espíritu Santo River (the River). The Mansiones development abuts the Creek, which then flows into the River across the street from the project. Before the incidents that gave rise to this case, the Creek was suitable for human consumption and recreation, and provided drinking water for the residents of the Municipality of Río Grande. The River is physically navigable by small boats from at least its mouth on the Atlantic Ocean to the Mansiones project. It is subject to the effects of the ebb and flow of marine tides.

Using either Justice Kennedy's or the plurality's test in Rapanos, the government presented sufficient evidence from which the jury could find, beyond a reasonable doubt, the required

-23-

jurisdictional nexus.  Agosto's guilt was established as to Count One.

### Counts Two, Three and Four

These counts charge the Agosto and Agosto Motors with aiding and abetting each other, and others, with specific illegal discharges that took place in October 2004 (Count Two) and January 2005 (Count Three).  See 18 U.S.C. § 2.  Agosto was charged with aiding and abetting an additional discharge occurring in March 2005 (Count Four).

Provided the government establishes the facts required to meet the elements of the crime charged by proof beyond a reasonable doubt, Appellants may be held indirectly responsible as aiders and abettors if they "associate[d] [themselves] with the venture, [] participate[d] in it as something that [they] want[ed] to bring about, [or] [sought] by [their] actions to make the venture succeed."  United States v. Lugo Guerrero, 524 F.3d 5, 13 (1st Cir. 2008).  It is settled that "a culpable aider and abettor need not perform the substantive offense, be present when it is performed, or be aware of the details of its execution."  United States v. Colón-Muñoz, 192 F.3d 210, 223 (1st Cir. 1999).

Further, we are required to consider all of the evidence in the light of the cases that have established, for some time, that a person who creates the conditions for, and has the ultimate responsibility for, a discharge, may be held liable for the

discharge.  See Sierra Club v. Abston Const. Co., 620 F.2d 41, 45 (5th Cir. 1980) (coal mine operators who built sediment basin held liable for discharge from basin's overflow because basin was "reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water"); United States v. Brittain, 931 F.2d 1413, 1420 (10th Cir. 1991) (a person whose "specific conduct . . . allowed the discharge to occur" is liable for CWA violation); United States v. Hubenka, 438 F.3d 1026, 1029-30 (10th Cir. 2006) (defendants who directed others to perform the illegal discharge liable for the discharge under CWA).

Appellants do not really challenge that the specific discharges listed in the indictment occurred; rather, they focus their attack on the sufficiency of the evidence of Appellants' actual knowledge of, and/or role in, the discharges.[4]  However, as we have already discussed, a reasonable jury could have found that Agosto had the requisite knowledge of the illegal discharges into the Creek by his agents and employees.  A jury could have found that Agosto carried out these actions at least in part to benefit his enterprises, including Agosto Motors.  The evidence is that Agosto, through his corporations, initially hired third parties to dispose of the pollutants, but then switched to doing this work

---

[4]  In any event, the government provided ample evidence that the illegal discharges alleged in the indictment were carried out by employees of Mansiones, including through the testimony of several eyewitnesses and/or participants.

-25-

with his own equipment and employees, who did so in violation of the CWA. To Agosto's overall activities and interventions can be added his orders to place trenches in the Mansiones project which a jury could have found were designed to channel raw sewage away from the sidewalks and streets and towards the Creek's basin, as charged in Count 4 of the Indictment. The jury could properly infer that these things were done to save Agosto money and to allow him to continue selling properties in the Mansiones development.

We also find that the evidence was more than sufficient to support the conviction of Agosto Motors on Counts 2 and 3. "[A] corporation may be held liable for the criminal acts of its agents so long as those agents are acting within the scope of employment." United States v. Potter, 463 F.3d 9, 25 (1st Cir. 2006); accord United States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35, 42 (1st Cir. 1991). Typically, "[t]he test is whether the agent is 'performing acts of the kind which he is authorized to perform,' and those acts are 'motivated -- at least in part -- by an intent to benefit the corporation.'" Potter, 463 F.3d at 25 (quoting United States v. Cincotta, 689 F.2d 238, 241-42 (1st Cir. 1982). Agosto Motors contends that the government presented insufficient evidence from which the jury could conclude that Agosto or anyone else acted to benefit Agosto Motors -- as opposed to Mansiones -- in connection with the illegal discharges. We disagree.

Agosto Motors and Mansiones were closely-held, family-run companies operating out of the same location, namely, the Agosto Motors dealership. Both companies used the same telephone and fax numbers. They had overlapping employees as well as officers. As to both entities, Agosto was the de facto chief executive. Significantly, the truck used to carry out the illegal discharges alleged in the indictment was registered to Agosto Motors and Agosto Motors paid its annual registration fees.[5] Agosto's son, Miguel, had purchased the truck in 2002 in connection with another business venture. Miguel was a Mansiones employee who was active in trying to sell homes in the development, and was well-aware of, and had some responsibilities related to, the septic tank problem. By November 2004, about a month after the illegal discharges began, Miguel was also a salaried employee of Agosto Motors.

At a minimum, this evidence was sufficient to permit the jury to reasonably infer that the truck's commercial registration was made available to Mansiones by employees of Agosto Motors for the purpose of carrying out the illegal discharges. The jury could also have concluded that this would not have taken place without the knowledge of Agosto, and was therefore within the scope of employment at Agosto Motors (i.e., per the orders of the boss, Agosto). In any event, the jury could have inferred that the

---

[5] Appellants emphasize that the government only proved that the truck's license plate was registered to Agosto Motors's commercial fleet. In any event, we think that is enough.

illegal discharges were undertaken "at least in part" to benefit Agosto Motors, even if they also benefitted Mansiones; the jury was not required to turn a blind eye to the inextricable relationship between the entities. On these facts, the evidence was sufficient for the jury to conclude that Agosto Motors aided and abetted the CWA violations charged in the indictment by providing the means by which those discharges were carried out.

As a matter of law the government presented sufficient evidence to allow a jury to find beyond a reasonable doubt that Appellants were aiders and abettors in the charged violations of the CWA.

### III. Conclusion

The conviction of Appellants is vacated and these cases are remanded for action consistent with this opinion.

**Vacated and Remanded**.

**"Concurring Opinion Follows"**

**HOWARD**, **Circuit Judge**, **concurring.** I join Judge Torruella's excellent opinion, adding three brief comments.

First, I agree that by failing to adequately consider an arrangement that would have allowed at least some spectators to be present in the courtroom during jury selection, the district court did not fulfill its obligation to conduct the careful balancing of interests as required by Presley. I do not, however, view our holding as suggesting that the trial judge court is in every case constitutionally required to adopt such an arrangement to preserve the defendant's public trial rights in the face of overcrowding.

Second, two of the government's primary arguments are that the closure was temporary and its impact de minimus, and that Agosto had an affirmative burden to request that the court reopen the courtroom once there was room for spectators. The difficulty that I have with these arguments is that, in addition to failing to consider reasonable alternatives to closing the proceeding and failing to make findings adequate to support the closure, the court took insufficient measures to ensure that the closure would be no broader than necessary, as demanded by Waller. Waller v. Georgia, 467 U.S. 39, 48 (1984).

Each argument hinges on our determining that the trial court only intended to close the courtroom until seats became available, and that it clearly conveyed this intention to the parties. The record, however, suggests otherwise. Although the

-29-

judge suggested that she would welcome spectators, she also told defense counsel twice in no uncertain terms that spectators would be welcome "as soon as the jury is selected."

With respect to the claim that the closure was temporary and its impact de minimus, whatever the judge's intentions might have been, her initial inadequate balancing set in motion a chain of events that resulted in the closure of the courtroom for the entirety of jury selection. Because the impact of the closure was substantial, it cannot support the invocation of a triviality exception.

As for the defendant's obligation, the defendant cannot be faulted for taking the trial judge's statement to mean that she had conclusively ruled on the issue. Even if a defendant might have a burden under other circumstances to inform the court when a lawful closure has ended, Agosto did not have that obligation here, as it was reasonable for him to conclude that the trial judge had closed the courtroom for the entirety of jury selection.

Finally, I agree that Agosto Motors should also be afforded a new trial, based on our resolution of the courtroom closure claim. Whether Agosto Motors waived objection to the closure is a close call; ultimately I would not find waiver. The claim has, however, been forfeited by the lack of a trial objection. I would nevertheless relieve Agosto Motors of its

forfeiture on plain error review, an issue that the government

barely mentions.