# United States Court of Appeals
## For the First Circuit

No. 07-2232

UNITED STATES OF AMERICA,

Appellee,

v.

RASHAUN SCOTT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Torruella, Stahl and Howard, Circuit Judges.

Paul Glickman, by Appointment of the Court, with whom Glickman Turley LLP was on brief for appellant.
Robert E. Richardson, Assistant U.S. Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

April 22, 2009

**STAHL, <u>Circuit Judge</u>.** Rashaun Scott appeals his felon-in-possession conviction under 18 U.S.C. § 922(g)(1). Scott raised three issues in his brief but withdrew one of his claims at oral argument.[1] Therefore, we evaluate only whether a Sixth Amendment violation occurred when the district court barred members of the public from entering or leaving the courtroom during the charging of the jury, and whether the trial evidence was sufficient to support the guilty verdict. As to both claims, we affirm.

Scott was found guilty by a jury of being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). The circumstances of his possession of the firearm are somewhat unusual. In 2004, Scott was nearing completion of a state criminal sentence at the Bristol County House of Corrections in North Dartmouth, Massachusetts. In preparation for his release, he submitted a plan to the Massachusetts Parole Board, proposing that he would live at his parents' house in Brockton, Massachusetts upon release. His sister also lived at the parents' home. Approval of his proposed plan was contingent on an inspection of the residence.

---

[1]In his brief, Scott argued that the audio tape of his intercepted jailhouse phone call was inaudible at various points and that the district court therefore erred by admitting the tape into evidence. He also argued that the court incorrectly allowed the jury to use a transcript of the tape, prepared by the United States, to interpret the allegedly inaudible portions of the tape. At oral argument, Scott waived his claims regarding the tape and the transcript. Therefore, we do not consider those issues and base our recitation of the facts and analysis of the sufficiency of the evidence on the transcript as provided by the government.

On May 13, 2004, Scott placed a phone call from the Bristol County House of Corrections to his parents' home. The call was recorded by an automated system and monitored by a Bristol County Sheriff's Department investigator. Scott's mother answered the phone and Scott told her that Parole was going to inspect her house prior to his release. He told her, "I'm about to talk in riddles, so really listen, and pay attention to me." Before continuing, Scott decided that he preferred to talk with his sister, who then got on the line. He first asked his sister to go into his childhood bedroom and look for an unnamed item under the mattress. When she didn't find anything hidden there, he tried to get her to understand what item he wanted her to find:

> **Scott:** All right, listen, umm, umm, you know, you know, you know, you know things I show you sometimes?
> **Sister:** Yeah.
> **Scott:** Where's those, where those at? The long one.
> **Sister:** The long one?
> **Scott:** Yeah. There's two of them. The long one.
> **Sister:** Closet.
> . . .
> **Scott:** Do me a favor.
> **Sister:** Uh huh.
> **Scott:** Put that in your room.
> **Sister:** OK.
> **Scott:** Don't let mom see.
> **Sister:** OK.

Scott's sister then told him that their mother "got rid of the other one." His mother then got on the line and interjected that she threw the object in a dumpster. Scott was incredulous, but

-3-

replied to his mother, "Just wanted to make sure, 'cause I don't want them to go there, and see that, and, you know? . . . I don't want them to go there and like look, snoop around, and find something, you know what I'm saying?"

His sister then got back on the phone and said, "I don't know where she threw the other one but the long one's in your room." Scott replied, "All right, take, go, go, you, you, I already told you what to do with that. . . Make sure you do it. . . Please make sure you do it."

Scott then asked his sister to place a three-way call to a friend of his, and while he waited on the line for the call to connect, he spoke with someone on his end of the line, presumably a fellow inmate. According to the transcript, he said:

> My mom threw one of them away but she didn't find the other one. 'Cause I have one down, like, quick load that fucker 'round the house . . . I don't know which one she got, 'cause they both was long, right?

Concerned that Scott's conversation suggested that there may have been a gun in his parents' house, the Brockton Police Department obtained a search warrant for the home. During the search, on May 14, 2004, a dog trained to alert to the presence of firearms led police to Scott's sister's closet, where they found a twelve-gauge shotgun.

A grand jury charged Scott as a felon in possession, and on November 17, 2005, a jury found him guilty. He was sentenced to

-4-

serve 235 months in prison due to his career offender status under U.S.S.G. § 4B1.1.

On appeal, Scott first argues that his Sixth Amendment right to a public trial was violated because the district court allegedly closed the courtroom during the charging of the jury. Because Scott did not object on these grounds at trial, we review only for plain error.  See United States v. Bucci, 525 F.3d 116, 129 (1st Cir. 2008).

We first examine the facts relevant to Scott's claim.  On the fourth day of the trial, during a break between closing arguments and the charging of the jury, the court spoke to the audience in the courtroom:

> Before I begin, ladies and gentlemen, this is a lengthy charge, and during the charge no one will be permitted or [sic] enter the room.  So if anyone needs to leave, you should go now. I'm happy to have you, I just want you to know you won't be able to leave once I get started.

The jury then entered the courtroom and the court addressed the jury:

> We're just make [sic] sure, ladies and gentlemen, that there is sufficient notice to people outside the courtroom that for the next several minutes, no one is to enter as I talk to you about the law and no one will be permitted to leave.

Despite Scott's contention, there is no evidence that the court continued to preclude the public from entering or leaving the

courtroom after the jury charge was completed. Therefore, we only analyze the import of the court's actions during the charging of the jury.

The Sixth Amendment of the Constitution guarantees a criminal defendant's right to a public trial. The Supreme Court has set forth an exacting test that allows for the closure of criminal trials only in very narrow circumstances. See Waller v. Georgia, 467 U.S. 39, 48 (1984) ("[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure."). Scott argues that the district court erred because it failed to consider the components of the Waller test before it ordered a closure for the duration of the jury charge. However, this argument presupposes that the courtroom was indeed closed to the public, a conclusion with which we do not agree.

Here, the district court announced to the already-present spectators that they were welcome to stay in the courtroom but that they would not be permitted to leave during the charging of the jury, presumably to avoid distracting the jury during the "lengthy" and complex charge. The court plainly had no intention of excluding the public as it told the assembled audience, "I'm happy

to have you," and no one was asked to leave. Indeed, just the opposite occurred. The spectators were told that if they chose to remain, they would be required to stay for the duration of the charge. In addition, we infer from the transcript that the court then took the further step of asking courtroom personnel to inform members of the public outside the courtroom that if they wished to observe the jury charge, they should enter the courtroom at that time or lose the opportunity to enter once the proceedings began. Again, the court invited the public in, rather than barring the public from entering.

Thus, this is a very different case from Waller v. Georgia, where the public was excluded from the courtroom for the duration of a seven-day suppression hearing, 467 U.S. at 42, and from our earlier case, Owens v. United States, which Scott relies upon, where the public, including members of the defendant's family, was barred from the courtroom for the duration of a one-day jury selection, 483 F.3d 48, 54-55 (1st Cir. 2007). In contrast, here, the public was invited to enter or remain in the courtroom and members of the public were actually present during the charging of the jury. In addition, there is no evidence that any member of the public who sought entry to the courtroom was denied access. Therefore, we find that no closure occurred in this case.

That said, it is true that if a hypothetical member of the public had arrived after the jury charge had commenced, he or

she would not have been able to gain access to the proceedings. However, the purpose of the public trial protection is to "benefit . . . the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." Waller, 467 U.S. at 46 (quoting In re Oliver, 333 U.S. 257, 270, n.25 (1948), in turn quoting T. Cooley, Constitutional Limitations 647 (8th ed. 1927)). In the case before us, the public was indeed present at the jury charge and with its presence cast the sharp light of public scrutiny on the trial proceedings, thus providing the defendant with the protections anticipated by the public trial provision of the Constitution. See Herring v. Meachum, 11 F.3d 374, 379-80 (2d Cir. 1993). That a hypothetical member of the public who arrived late for the jury charge might have been barred from the proceedings does not undermine the public nature of the proceedings as they were actually conducted, though it may have implications for the hypothetical late-arriving person's individual right of access (a question we are not presented with in this case and decline to address).

Though we find that no closure occurred in this case, we do sound a note of caution. The district court here made a reasonable judgment that the lengthy and complex nature of the jury charge in this particular case justified requiring that members of

the public not enter or exit the courtroom during the instruction. The court also took careful steps to greatly reduce the chance that an interested member of the public would miss the opportunity to observe the charge by announcing the rule in the courtroom before the instruction began and asking court personnel to relay the information to anyone standing in the hallway. In addition, the court did not employ the procedure during any other part of the trial, and the period during which observers were not permitted to enter or exit was quite brief. In all, the court acted with caution and restraint, preserving the defendant's right to a public trial while also facilitating the orderly and efficient functioning of the courtroom. We caution, however, that a procedure such as this should be employed only carefully and sparingly, in order to avoid even the appearance that our nation's courtrooms are closed or inaccessible to the public. We commend to the sound judgment of the district court the responsibility, in the first instance, of ensuring both openness and order, and above all, preserving the defendant's constitutional right to a public trial.

Scott's second argument on appeal is that his conviction must be vacated because the government failed to present sufficient evidence upon which a reasonable jury could conclude that he had constructive possession of the shotgun found in his sister's closet. In his brief, Scott first argued that because the audio tape should not have been admitted into evidence, there was an

insufficient factual basis for his conviction.  Because he waived objection to the audio tape during oral argument, we do not address this contention.

In the alternative, Scott argues that even with the audio tape in evidence no reasonable jury could have concluded beyond a reasonable doubt that he had constructive possession of the shotgun.  He points out that the gun was found in his sister's closet, at a home where he did not reside, and that no evidence was presented as to Scott's prior ownership or use of the weapon.

We review a sufficiency claim de novo, drawing all reasonable inferences in favor of the verdict to determine whether a rational jury could find each element of the crime beyond a reasonable doubt.  United States v. DeCologero, 530 F.3d 36, 65 (1st Cir. 2008).  "It is not our role to weigh witness credibility and we will resolve all such issues in favor of the government." United States v. Wight, 968 F.2d 1393, 1395 (1st Cir. 1992).  A felon-in-possession conviction requires proof that the defendant had a prior felony conviction for an offense punishable by imprisonment for a term exceeding one year and had knowing possession of a firearm in or affecting interstate commerce.  See 18 U.S.C. § 922(g)(1); see also United States v. Ramos, 961 F.2d 1003, 1004 (1st Cir. 1992); Wight, 968 F.2d at 1397.  Scott does not contest the sufficiency of the evidence as to the predicate felony offense or the firearm's relationship to interstate

-10-

commerce; therefore we only consider the sufficiency of the evidence as to possession.

The element of knowing possession can be established by proving constructive possession, which requires that the defendant "knowingly ha[d] the power and the intention at a given time of exercising dominion and control over a firearm or over the area in which the weapon is located, directly or through others." Wight, 968 F.2d at 1398. "[M]ere presence or association with another who possessed the contraband is insufficient to establish constructive possession." Id. at 1397. However, constructive possession does not require ownership of the firearm, and can be established through the use of either direct or circumstantial evidence. DeCologero, 530 F.3d at 67. In addition, constructive possession can be brief: "a minute of possession is as much an offense as a year of possession." DeCologero, 530 F.3d at 67 (quoting United States v. Zavala Maldonado, 23 F.3d 4, 8 (1st Cir. 1994)).

Given this broad definition of constructive possession, there was enough evidence here for the jury to find that Scott knowingly possessed the shotgun. Scott chiefly complains that the evidence against him lacked "the specificity, certainty, and logic" of the evidence presented in other constructive possession cases. But we do not review whether the jury's verdict was based on certainty, but merely whether a reasonable jury could find possession beyond a reasonable doubt. There was enough here that

-11-

the jury could have concluded that Scott exercised dominion and control over the shotgun.  First, he explained to his mother that he was going to talk in "riddles," which suggests he intended to discuss a forbidden topic while avoiding detection by prison officials.  Second, he instructed his sister to look for "the long one" in his bedroom and told someone on his end of the line that the item was a "quick load."  A jury could reasonably have concluded that Scott was discussing some type of contraband, one with a "quick load" feature.  Third and most importantly, Scott told his sister to hide "the long one" in her bedroom closet and the police search uncovered a shotgun in the very same location.  A reasonable jury could conclude that Scott exercised dominion and control over the shotgun through his sister, by telling her where to hide the firearm so that it would not be found during the probation inspection.

Scott argues that the jury's verdict is undermined by the fact that he did not live in the house where the gun was found, there was no evidence presented of his actual prior use or ownership of the weapon, and his alleged possession was effected entirely over the telephone wire.  To be sure, these are valid arguments that could be made to a jury, but a jury would be free to discount them and conclude instead that Scott asked his sister to move his shotgun so that it would not be discovered during the

prerelease inspection.  The jury reasonably so concluded, and we will not disrupt its conclusion.

For the foregoing reasons we find no error and <u>affirm</u> Scott's conviction.