Filed 12/11/15  P. v. Valladares CA1/2

Order modifying opinion filed 11/20/15 (unmodified opn. attached)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>EUSEBIO VALLADARES,<br><br>       Defendant and Appellant. | A134585<br><br>(San Mateo County<br>Super. Ct. No. SC071474A) |

BY THE COURT:

It is ordered that the opinion filed herein on November 20, 2015, be modified as follows:

In the second paragraph on page 17, the third sentence beginning with "Nor is there any evidence" is changed to "Nor is there any direct evidence".

The petition for rehearing is denied.  This modification does not change the judgment.

Dated:_____                          _____
                                                                                   Kline, P.J.

1

Filed 11/20/15  P. v. Valladares CA1/2 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EUSEBIO VALLADARES,<br><br>        Defendant and Appellant. | A134585<br><br>(San Mateo County<br>Super. Ct. No. SC071474A) |

Defendant Eusebio Valladares appeals from the judgment following his conviction for 16 counts of lewd and lascivious conduct against a child under 14 years of age, and one count of unlawful sexual intercourse or sodomy against a victim 10 years old or younger.  He argues that statements he made to police and used against him at trial were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and that to the extent his *Miranda*-related arguments were not made to the trial court, his trial counsel was ineffective for failing to raise them.  He also argues that his constitutional right to a public trial was violated when the trial judge locked the courtroom while instructing the jury.  We will affirm the judgment.

**BACKGROUND**

Defendant, age 61 at the time of his arrest, lived with his wife in a rented room in a house in Redwood City.  The owner of the house also lived there, as did her 10-year-old and 8-year-old daughters, who are two of the four young victims in this case.

The incidents in this case came to light on March 13, 2010, when an 11-year-old girl reported to her mother about sexual contact with defendant that occurred when the

1

girl was visiting the landlord's 10-year-old and 8-year-old daughters two days earlier. Officer Jason Gamble of the Redwood City Police Department spoke to two of the girls on the evening of March 13, apparently in response to a report of child abuse. Afterward, Gamble and Officer Oscar Poveda contacted defendant at the house he resided in, either in his bedroom or in a common area of the house. Poveda asked defendant in Spanish if he would voluntarily come down to the police station to talk about the reason he and Gamble were at the house. Poveda testified at trial that defendant was cooperative and said he wanted to come to the police station and tell his story.

Defendant was transported to the police station in the front passenger seat of a patrol car. At the police station, defendant went into an interview room with Poveda and Gamble. The record on appeal contains almost no details about what happened between the time defendant left his house and entered the interview room.

*Defendant's Statements to Police*

A timestamp on a video of the interview indicates the questioning began at 1:31 a.m. on March 14. The video shows that defendant was not handcuffed or otherwise restrained. During the interview, Poveda asked defendant questions in Spanish. Gamble would sometimes ask a question in English, which Poveda would translate to Spanish for defendant. Defendant responded in Spanish, and Poveda translated defendant's answers to English.

The following description of the interview is taken from a written transcript submitted to the trial court in connection with defendant's motion to suppress his statements. The transcript contains a Spanish transcription and English translation of the interview.

Poveda began the interview by telling defendant the door behind defendant was open and that he was free to leave at anytime. Defendant said he understood. The video shows that Poveda demonstrated to defendant that the door was unlocked and that defendant stood up and observed Poveda. After briefly talking to defendant about his background, Poveda asked defendant if he knew why the police wanted to talk to him. Defendant said he heard the police were called because "supposedly, I had kissed the

2

girl." Defendant then described an incident at his house the previous Thursday where the owner's 10-year-old daughter and another girl pushed defendant back-and-forth into each other, causing defendant to touch one girl's breasts and the other girl's leg or groin area. Defendant also told the officers that when he used the bathroom, the "children" would touch him "In front, and even from behind," although it is unclear if defendant was referring to the previous Thursday or another time. The officers expressed skepticism over defendant's story, with Poveda asking defendant if other people would think he was telling the truth.

Referring again to the previous Thursday, Poveda asked defendant "at what time did you take out your penis and show it to the girls?" Defendant denied exposing his penis. Poveda said he thought defendant was lying and could tell by defendant's body language. Defendant responded that "I'm going to talk to you directly."

Defendant explained that the owner of the house would send her 10-year-old daughter into defendant's bedroom "completely naked" to ask for money. Poveda asked defendant for more details and was confused by defendant's responses, telling defendant "I'm asking you a question!" and "Look at me!"[1] Defendant said he saw the daughter without her clothes on "a lot of times" and, after being told to be more specific, said "five times." Poveda also asked how many times "did the little girls see you naked?" Defendant responded at least two or three times.

Poveda returned to asking defendant about the incident from Thursday, with defendant explaining again that the two girls pushed him back and forth. Defendant said he touched one girl's legs and the other girl's breasts during this incident. Poveda told defendant that he thought defendant was lying and asked defendant if he wanted to take a lie detector test. Defendant said he did not know if he would be willing to take a lie detector test. Poveda responded that "we think that you're not telling the whole truth." He then told defendant that "we're not saying that you're under arrest, Ok? But, no, and

---

[1] Although the transcript of the interview attaches exclamation points to Poveda's statements, the video shows that he did not significantly raise his voice.

you can leave whenever you want, but we want to know the truth." Defendant said "It's difficult to get to that place" and "What are the motives? What are the motives from the beginning? For someone." Poveda did not understand these responses. He eventually asked defendant, "part of what you're saying is the truth. Right?" Defendant responded "Uh, yes." Poveda asked, "what is the thing that's not the truth, that you said?" Poveda also told defendant that "seeing you, how you're moving and everything, and talking, we know that you're not telling the truth."

Defendant then told Poveda that the owner's 10-year-old daughter would come to him and ask for money in return for sex. Defendant then admitted he had sex with the owner's 10-year-old daughter. Poveda asked defendant when this occurred, and defendant responded "about a month ago. But I really don't remember." Poveda asked defendant if he put his penis in her vagina, and defendant said he did.

Officer Gamble briefly left the room and, upon returning, told Officer Poveda to read defendant his *Miranda* rights, which Poveda proceeded to do in Spanish. This occurred one hour and three minutes after the questioning began. Poveda (referred to as "Interpreter" in the transcript) explained defendant's right to an attorney at no cost as follows:

"INTERPRETER: If you cannot pay for an attorney one will be given to you at no cost, uh, from any . . . if you talk . . . [Clears his throat] . . . before we ask, ask any questions if you let us. You understand? Yes or no?

"VALLADARES: Any questions.

"INTERPRETER: If you cannot pay for an attorney, one will be given to you at no cost from any . . . we ask any questions if you let us. You understand?

"VALLADARES: Yes."

Defendant was then given a written form that listed his *Miranda* rights in Spanish. A translated version of the Spanish form, which was offered in evidence at the suppression hearing, listed the *Miranda* warnings as follows:

"1.    You have the right to remain silent. [¶] Do you understand?

4

"2.    Anything that you say can be used against you in a court of law.  [¶] Do you understand?

"3.    You have the right to an attorney present before and during any questions that are asked of you.  [¶] Do you understand?

"4.    If you do not have means to pay for an attorney, you will be given one without cost before being asked any questions, if you so desire.  [¶] Do you understand?"

Next to each warning was a space where defendant could mark "Si" or "No" regarding whether he understood.

Referring to the form he had given defendant, Poveda said "Those are the questions I told you about regarding your rights" and "Read it and mark yes, if you understand."  After defendant read the third warning, the following colloquy ensued:

"VALLADARES:  "I can't answer this one because I don't know how much they are going to charge me.

"INTERPRETER:  No.  Read, read that one too.

"VALLADARES:  Ok.

"INTERPRETER:  More, more or less it's what you read and understand if, if you under-, you would be within your, your rights, you mark yes.  And you can sign it here please and put your name down."

"VALLADARES:  My signature over here?

"INTERPRETER:  Yes, sign here and put your name.  And, um, if you understand this right.  Yes or no?

"VALLADARES:  Yes.

"INTERPRETER:  Ok."

The written form shows that defendant wrote "Si" in the space next to each admonition asking whether he understood his rights.  Defendant also signed the bottom of the form in a space designated for his signature.

Poveda then continued to question defendant about having sex with the landlord's 10-year-old daughter.  Defendant stated they first had sex about two years earlier.  He said the last time they had sex was 15 days earlier, and that he paid her 20 dollars.  He

5

also described an incident in which a group of girls, including three of the victims in this case, threw defendant onto his bed, then tried to take off his pants and orally copulate him.

Poveda ended the interview by asking defendant if he wanted to write an apology letter to one of the victims. Defendant agreed, and wrote a letter stating, "I feel very bad for what happened to your friend and [one of the victim's]. I won't do it again." Defendant was arrested after the interview.

Two days later on March 16, defendant was interviewed by David Cirina, a Redwood City police detective. Cirina spoke to defendant primarily in Spanish. Cirina advised defendant of his *Miranda* rights. Defendant told Cirina that he understood each of the rights and waived them. During the subsequent questioning, defendant said he had sexual intercourse with his landlord's 10-year old daughter on three separate occasions, and also admitted to having sexual intercourse with the landlord's 8-year-old daughter. He also said he engaged in a sexual act with another 10-year-old girl.

*Pretrial Proceedings*

Defendant was charged with 28 counts of lewd and lascivious conduct against a child under 14 years of age (Pen. Code, § 288, subd. (a)),[2] one count of lewd and lascivious conduct against a child under 14 years of age by use of force or fear (§ 288, subd. (b)), and one count of unlawful sexual intercourse or sodomy against a victim 10 years old or younger (§ 288.7, subd. (a)). There were four alleged victims, including the three girls with whom defendant admitted to engaging in sexual acts when questioned by police.

Before trial, defendant's counsel made an oral motion "to suppress [defendant's] statement as it was in violation of Miranda." The motion focused solely on the March 14 interview. Defendant's counsel stated: "The Miranda admonition given by the police officer was garbled and confusing, and I believe the Court already has a transcript of the Miranda given. And in light of the garbled nature of the admonition, we think that also,

---

[2] All further unspecified statutory references are to the Penal Code.

in effect, the later written admonition that my client signed, especially since the transcript shows that he was confused about whether or not he wouldn't know how much it would cost for an attorney, so—and in addition to that, we're moving to suppress his statement, and my client would like to testify and explain to the Court how it was that his statement was involuntarily [sic] because of the pressure he was put under by the police."

Defendant then testified at the suppression hearing. When his attorney asked "did the Redwood City Police pressure you into making a statement?", he responded: "Not pressure, but the motive of that statement and the four signatures that I signed in the form—my spirits were down. I was not competent very well to listen very well." Regarding the written form that he signed on March 14, defendant said that a police officer "made me sign." However, defendant then said that the officer "did not force me, but he did speak to me very fast with a very forceful way about him. His character was somewhat in a desperate way was making me nervous." Defendant described how the officer explained the *Miranda* form to defendant and said the officer told him "if you did this, say yes. And if you did not, say no." Although defendant acknowledged on the written form that he understood each of his *Miranda* rights and then signed the bottom of the form, defendant testified that he did not read the *Miranda* rights listed on the form. He said the officer's "character was quite strong" and "[v]ery quickly he said sign, sign it. And that is the reason or the motive why I signed." Defendant also said that the police lied to get him out of his home without being prepared ahead of time with an attorney. Defendant, however, was unable to state what the specific lie was. After defendant's counsel finished his questioning, he offered in evidence the transcript of the March 14 interrogation and the written *Miranda* form.

The prosecutor did not cross-examine defendant. The prosecutor presented the People's case by way of an offer of proof,[3] stating that defendant was contacted at his house by Officers Poveda and Gamble, and asked by a Spanish-speaking officer whether

---

[3] The prosecutor began by noting that "just for the record, the Court has allowed me to proceed by way of offers of proof[.]" The reason for this procedure is not apparent in the record and was not objected to by defendant's counsel.

he would accompany them to the Redwood City police station. Defendant agreed, and was driven to the police station in the front passenger seat of a patrol car, "meaning that he was able to unlock and exit that door, unlike the rear seat of a police car." At the police station, the officers pointed out the exits and told defendant that although a key is required to enter the station, no key is required to leave. Once they were in the interrogation room, they offered defendant water and reminded him he was free to leave.

The prosecutor then argued that there were no defects with the oral *Miranda* warnings and that the *Miranda* warnings in the written form were "perfect." The prosecutor also argued that, by defendant's own admission, he was never pressured by the officers, and that there was no basis to find any coercion on the part of the officers. Defendant's counsel did not present further evidence or argument in response.

The trial court denied the suppression motion. The court stated that it had reviewed the transcript of the March 14 interrogation and the written *Miranda* form signed by defendant and considered defendant's testimony. The court noted that defendant, by his own admission, "indicate[d] that the police did not pressure him." With respect to the written *Miranda* form, the court said that defendant admitted he was not forced to sign the form, and that "[w]ith respect to the particular form itself, [defendant] indicated that the officer said, if you did this, say yes. If you did not do this, say no. There was nothing by that particular statement that would indicate to the Court there was any coercion taking place." The court said that it "can find no actions on the part of the police that would seem to indicate in the slightest that they coerced [defendant] into either waiving his rights verbally . . . or in signing the form . . . ." As to defendant's statement that the officers wanted him to sign quickly, the trial court said it "does not find that to be supported by the evidence." The court concluded: "Based on all of the above and based on the totality of the circumstances, the Court does not find that the officers engaged in any inappropriate behavior. The Court does not find the actions of the officers amounted to coercion. [¶] In fact, the Court finds that the waiver of the rights on behalf of [defendant] was voluntary and consensual. [¶] And based upon all of that, the Court will deny the defense motion to exclude [defendant's] statement."

*Trial Proceedings*

A jury trial commenced on November 21, 2011. After the close of evidence, the trial court granted the prosecution's motion to dismiss two of the counts for lewd and lascivious conduct.

While the jury was deliberating, defendant moved for a mistrial upon learning that the courtroom had been locked when the jury was instructed earlier that day. The trial court denied the motion.

The jury found defendant guilty of 16 counts of lewd and lascivious conduct against a child under 14 years of age (§ 288, subd. (a)), and one count of unlawful sexual intercourse or sodomy against a victim 10 years old or younger (§ 288.7, subd. (a)). It also found true the multiple-victim allegation attendant to each of the counts. The jury was unable to reach a verdict as to four of the counts for lewd and lascivious conduct. The court declared a mistrial on those counts and granted the prosecution's motion to dismiss them. As to the remaining counts, the jury acquitted defendant of lewd and lascivious conduct, but convicted him of three lesser-included offenses: assault (§ 240), battery (§ 242), and attempted lewd and lascivious conduct (§§ 664; 288, subd. (a)). Prior to sentencing, the trial court granted the prosecution's motion to dismiss those remaining counts in the interest of justice.

The trial court sentenced defendant to 70 years to life in prison. He timely filed this appeal.

## DISCUSSION

### I. Admission of Defendant's Statements

Defendant argues that the statements he made to police on March 14 and March 16 were obtained in violation of *Miranda* and his Fifth Amendment rights, and should have been suppressed. He argues that the statements he made on March 14 prior to receiving *Miranda* warnings should have been suppressed because he was subject to custodial interrogation during that time. He argues that his post-warning statements on March 14 should have been suppressed because the *Miranda* warnings eventually read to him were inadequate, and he did not knowingly waive them. Finally, he argues that his post-

9

warning statements on March 14 and all of his statements on March 16 should have been suppressed because they were obtained as part of a two-step interrogation technique prohibited by the United States Supreme Court's opinion in *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*). Defendant argues that to the extent these arguments were not raised to the trial court, his trial counsel was ineffective for failing to raise them.

A.  *Standard of Review*

"The rule of *Miranda* is well established: '[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.' [Citation.]" (*People v. Jennings* (1988) 46 Cal.3d 963, 976.) "In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

A defendant arguing on appeal that his trial counsel was ineffective for failing to raise an argument has the burden of showing that trial counsel's representation

10

" ' " ' "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' " ' " (*People v. Vines* (2011) 51 Cal.4th 830, 875.)  "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.)  " ' " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.' " [Citation.]' [Citation.]  If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected," ' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' [Citation.]" (*People v. Vines, supra*, 51 Cal.4th at p. 876.)  "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)

B.     *Defendant's Pre-Miranda Statements on March 14*

Defendant argues that prior to any admission he made at the police station on March 14, he was "subjected to custodial interrogation requiring *Miranda* warnings be given."  As such, he argues that the statements he made before he was read his *Miranda* rights approximately one hour into the interview should have been suppressed. Defendant concedes that his trial counsel did not raise this argument to the trial court, but argues that trial counsel's failure to do so constitutes ineffective assistance of counsel.

The Attorney General argues that defendant has forfeited this argument on appeal because it was not raised to the trial court.  The Attorney General also argues that defendant has not shown his trial counsel was ineffective for failing to raise this argument because the argument would have failed.  The Attorney General does not dispute that defendant was subject to interrogation once at the police station, but argues that he was

11

not in custody when the interview began and, as such, the officers were not required to read him his rights earlier than they did.

Because defendant did not argue to the trial court that he was in custody before making any admissions, this argument is forfeited on appeal. (*People v. Haley* (2004) 34 Cal.4th 283, 300.) Furthermore, we cannot conclude on the record before us that defendant's trial counsel was ineffective for failing to argue that defendant was in custody prior to making any admissions.

"An appellate court should not declare that a police officer acted unlawfully, suppress relevant evidence, set aside a jury verdict, and brand a defense attorney incompetent unless it can be truly confident all the relevant facts have been developed and the police and prosecution had a full opportunity to defend the admissibility of the evidence." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.) The relevant facts for determining whether defendant was in custody relate to whether a reasonable person in defendant's position would believe there was "a restraint on [his] freedom of movement of the degree associated with a formal arrest." (*People v. Moore* (2011) 51 Cal.4th 386, 395.) The record on appeal is lacking information that is critical to this analysis because it contains hardly any facts about what happened between the time police contacted defendant at his house on the evening of March 13 and interviewed him on the morning of March 14. Officers Poveda and Gamble did not testify at the suppression hearing, and defendant's testimony during the hearing was primarily focused on the interview with police, not what happened before the interview.[4] Defendant's testimony during the

---

[4] Poveda and Gamble testified at trial, but their testimony shed little light on what happened before they and defendant entered the interview room. Poveda testified that he contacted defendant in his bedroom and asked him in Spanish if he would voluntarily come down to the police station "and talk to us about the reason we were there," although Poveda did not testify what the reason was. Defendant responded that he wanted to tell his side of his story, grabbed his bible, and rode with Poveda in a patrol car to the police station. Gamble testified that he and Poveda went to defendant's house in response to a report of child abuse and encountered defendant outside of his bedroom. Defendant was not placed under arrest at the house. He was transported to the police station in the front

12

suppression hearing was primarily focused on the interview with police, not what happened before the interview.  As such, we know very little about what happened at defendant's house after police contacted him, in the police car, or at the police station before defendant entered the interview room.

It could be that trial counsel discovered that defendant was cooperating with the officers before the interview and wanted to tell his side of the story to the officers, as Officer Poveda testified was the case at trial.  This would be a "satisfactory explanation" for trial counsel's decision not to argue that defendant was in custody.  (*People v. Vines, supra*, 51 Cal.4th at p. 875-876.)  But it could also be the case that trial counsel had no good reason for failing to argue that defendant was in custody.  The bottom line is that we do not know.  In such a situation, we must reject defendant's contention that his trial counsel was ineffective for not making a custody argument.  (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 267.)  The claim is "more appropriately decided in a habeas corpus proceeding."  (*Ibid.*)

C.       *The Miranda Warnings on March 14*

Defendant argues on appeal that he did not receive adequate *Miranda* warnings during the March 14 questioning, and that he did not knowingly waive his rights.  Focusing specifically on his right to an attorney at no cost, defendant contends that the verbal warning was given "in a way that no reasonable person could understand."  He further contends that his "lack of understanding that he was entitled to a free lawyer before any questioning could begin was obvious" because as he was reading the written *Miranda* form, he said "I can't answer this one because I don't know how much they are going to charge me."  The Attorney General contends that this argument is without merit because defendant was adequately informed of his rights both orally and in writing, and indicated that he understood his rights.

---

seat of Poveda's patrol car, which could be unlocked from the inside, and entered the police station through the front doors with the officers.

"In determining whether police officers adequately conveyed the four [*Miranda*] warnings . . . reviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*." ' [Citations.]" (*Florida v. Powell* (2010) 559 U.S. 50, 60.) " '[A]lthough there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was [voluntary,] knowing[,] and intelligent under the totality of the circumstances surrounding the interrogation.' [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 425.) The waiver must have been " ' "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." ' [Citation.]" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1269.) The California Supreme Court "has long recognized that a defendant's decision to answer questions after indicating that he or she understands the *Miranda* rights may support a finding of implied waiver, under the totality of the circumstances." (*Ibid*.)

Here, the police reasonably conveyed to defendant that he had the right to an attorney present before and during any questioning, and that he would be given an attorney at no cost if he could not afford one. Officer Poveda, albeit inartfully, verbally admonished defendant as to these rights. When asked if he understood these rights, defendant responded "Yes." Any ambiguity with the verbal admonition was clarified by the written *Miranda* form provided to defendant, which was unequivocal. The form stated in Spanish: "You have the right to have an attorney present before and during any questions that are asked of you." Defendant appeared to hesitate after reading this right and told Poveda, "I can't answer this one because I don't know how much they are going to charge me." Poveda addressed defendant's question by directing him to the final admonition on the form, telling him "No. Read, read that one too." This last admonition was unequivocal. It stated in Spanish: "If you do not have means to pay for an attorney, you will be given one without cost before being asked any questions, if you so desire." Poveda asked defendant "if you understand this right. Yes or no?" Defendant orally

14

responded "Yes."  Defendant then indicated on the form that he understood all of his rights, including his right to an attorney present during questioning, and his right to an attorney at no cost should he be unable to afford one.  These circumstances establish that defendant understood his *Miranda* rights, including his right to an attorney at no cost. Because defendant continued speaking with the officers after acknowledging his *Miranda* rights, the record supports a finding that he waived those rights.  (*People v. Gonzales, supra*, 54 Cal.4th at p. 1269.)[5]

D.      *Defendant's March 14 Post-Miranda Statements and March 16 Statements*

Defendant argues that the statements he made after receiving *Miranda* warnings on March 14 and all of his statements on March 16 should have been suppressed because they were obtained as part of a two-step interrogation technique prohibited by the United States Supreme Court's opinion in *Seibert, supra,* 542 U.S. 600.  He concedes that this argument was not raised to the trial court, but argues that trial counsel's failure to make this argument constituted ineffective assistance of counsel.

The Attorney General argues that defendant's *Seibert* argument is forfeited on appeal because it was never raised to the trial court.  The Attorney General also argues that defendant's trial counsel was not ineffective for failing to make a *Seibert* argument

---

[5] Our conclusion that defendant knowingly waived his *Miranda* rights is bolstered by the video of the March 14 interview, which is part of the record on appeal and was shown in large part to the jury, but apparently not considered in connection with defendant's suppression motion.  The video shows defendant was presented with the written form, took several seconds to read the first two warnings, and acknowledged on the form that he understood those warnings.  After reading the third warning—the right to an attorney—defendant said, "I can't answer this one because I don't know how much they are going to charge me."  When Poveda responded, "No.  Read, read that one too," he was apparently referring defendant to the fourth warning—the right to an attorney at no cost.  Defendant took several seconds to read that warning, and then acknowledged on the form that he understood it.  Realizing that defendant did not acknowledge the third warning, Poveda referred him back to it and asked "if you understand this right.  Yes or no?"  Defendant took several seconds to read the third warning again, then signed it. Contrary to defendant's testimony at the suppression hearing, it does not appear that the officers rushed defendant as he was reading the form.

15

because *Seibert* is inapplicable to the circumstance of the March 14 and March 16 questioning.

Defendant has forfeited his *Seibert* argument on appeal because he did not raise it to the trial court. (*People v. Haley, supra*, 34 Cal.4th at p. 300.) We also reject defendant's claim of ineffective assistance of counsel because, as was the case with his custody argument, the relevant facts have not been sufficiently developed for us determine whether *Seibert* applies.

In *Seibert*, the defendant was arrested on suspicions of murdering a mentally disabled child, then subjected to aggressive questioning that was "systematic, exhaustive, and managed with psychological skill" without being read *Miranda* warnings. (*Seibert, supra,* 542 U.S. at p. 616.) After Seibert admitted that she intended for the child to die, the police gave her a 20–minute coffee and cigarette break, administered *Miranda* warnings, and got her to repeat her admission. (*Id.* at p. 605.) An officer later testified that "he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.' " (*Id.* at pp. 605-606.)

The United States Supreme Court held that Seibert's post-warning statements were inadmissible. (*Seibert, supra,* 542 U.S. at p. 617.) A plurality of the court noted that *Miranda*'s purpose was to address " 'interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice' about speaking," and that "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." (*Id.* at p. 611.) According to the plurality, "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." (*Id.* at pp. 611-612.) The plurality concluded that "because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose, Seibert's postwarning statements are inadmissible." (*Id.* at p. 617.)

16

In a concurring opinion, Justice Kennedy stated that the "plurality opinion is correct to conclude that statements obtained through the use of this technique are inadmissible." (*Seibert, supra*, 542 U.S. at p. 618 (conc. opn. of Kennedy J.).) Justice Kennedy, however, believed that the plurality opinion "cuts too broadly" because it applied in "case[s] of both intentional and unintentional two-stage interrogations." (*Id.* at p. 621.) Justice Kennedy stated he "would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Id.* at p. 622.) He concluded that "[w]hen an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." (*Id.* at p. 621.) We agree with the many courts that have determined that Justice Kennedy's concurrence represents *Seibert*'s holding because he concurred in the judgment on the narrowest grounds. (E.g. *People v. Camino* (2010) 188 Cal.App.4th 1359, 1370; *United States v. Williams* (2006) 435 F.3d 1148, 1157.)

Facts relevant to whether Poveda and Gamble used a "deliberate, two-step strategy, predicated upon violating *Miranda*" have not been developed, at least in the record before us on appeal. (*Seibert, supra,* 542 U.S. at p. 621 (conc. opn. of Kennedy J.).) Defendant's trial counsel did not examine Poveda and Gamble during the suppression hearing to elicit testimony about their strategy for interviewing defendant. Nor is there any evidence regarding how Poveda and Gamble were trained to interview potential suspects.[6] It is possible that defendant's trial counsel researched these facts before the suppression hearing and concluded that the officers did not use a technique that violated *Seibert*. Or perhaps he never thought of the issue. Since we do not know, it

---

[6] Defendant, citing a law review article, argues that police officers are trained to tell suspects they are free to leave an interview in order to avoid giving *Miranda* warnings. Defendant, however, has not cited anything in the record showing that Poveda and Gamble were given such training.

would be inappropriate to determine that trial counsel was ineffective for failing to raise a *Seibert* argument.  (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 267.)

## II. The Trial Court's Locking of the Courtroom During Jury Instructions

Defendant argues that his constitutional right to a public trial was violated when the trial judge locked the courtroom while instructing the jury.

The jury was instructed on the morning of November 28, 2011.  The clerk's minutes indicate that the instructions lasted no more than 50 minutes.  The minutes and the reporter's transcript contain no indication that the trial judge locked the courtroom when the jury was instructed.  In the afternoon session on November 28 after the jury was excused to deliberate, defendant's counsel moved for a mistrial.  The sum total of the record on this issue is as follows:

"THE COURT:  All right.  And then, Mr. Devoy [defendant's counsel], I understand you have a motion.

"MR. DEVOY:  Yes.  It's been reported to me that two attorneys or at least two— well two . . . [¶] —attorneys attempted to come in during the morning session and the door was locked, and so I'm moving for a mistrial because that denies Mr. Valladares his right to a Sixth Amendment trial in open court.  Submitted.

"THE COURT:  Okay.  Before I rule on the motion, I should state that it's this Court's policy to have the door locked while the Court instructs.  [¶] And Deputy Bates, in accordance with the Court's policy, did lock the doors while the Court was instructing, and this Court actually observed Deputy Bates unlock the doors after the instructions were completed, and he came back in with a sign that is posted at the time that—in addition to locking the door, he puts a sign out indicating that the Court is instructing. [¶] So unless Deputy Bates has something otherwise to say, this Court is informed and believes that the doors were unlocked at all other times including when the counsel was making the closing arguments.  [¶] Deputy Bates; is that correct?

"THE BAILIFF:  That's correct.

"THE COURT:  Okay.  Based on that, the Court will deny the motion for mistrial."

Defendant contends that the trial judge was required to "articulate an 'overriding interest' as to why the court should be closed to the public" during jury instructions and "ensure that the closure was no broader than necessary," and, having failed to do so, committed structural error that requires reversal without a showing of prejudice. The Attorney General argues that defendant's right to a public trial was not violated because locking the courtroom during instructions was a "de minimis" closure that did not rise to the level of a constitutional violation.

"Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times. (See U.S. Const., amends. VI, XIV; Cal. Const., art. I, § 15; see also Pen. Code § 686, subd. 1.)" (*People v. Woodward* (1992) 4 Cal.4th 376, 382.) As explained by the United States Supreme Court in *Waller v. Georgia* (1984) 467 U.S. 39, " ' " '[t]he requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions. . . .' " ' " (*Id.* at p. 46.) "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." (*Ibid.*) The *Waller* court held that the right to a public trial creates a " 'presumption of openness' " that " 'may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " (*Id.* at p. 45.) When such a " 'higher value[]' " is advanced, it must be " 'articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " (*Ibid.*)

In *People v. Woodward, supra*, 4 Cal.4th at pp. 384-385, the California Supreme Court stated that certain courtroom closures are so "trivial" or "de minimis" that they do not implicate the principles identified in *Waller*. In *Woodward*, the trial court closed and locked the courtroom during closing argument, and placed a sign on the courtroom door reading: "Trial in progress—Please do not enter . . . ." (*Id.* at p. 380.) Defense counsel observed the sign during a recess and promptly moved for a mistrial. (*Ibid.*) The trial

19

court denied the motion, although it agreed to take the sign down and unlock the courtroom. (*Ibid.*) The trial court stated that it locked the courtroom because it was located next to the probate department and lawyers seeking ex parte orders "were apt to cause 'constant interruptions.' " (*Ibid.*) The trial court also "stated for the record a further reason supporting the temporary closure of the courtroom to additional spectators namely, that defendant's trial posed unusual security risks." (*Ibid.*) It also stated that members of the public were present during the closing argument, and that additional spectators could enter the courtroom during specified recesses. (*Id.* at pp. 380, 385.) The Supreme Court determined that this "temporary closure" was "de minimis" and did not implicate the interests identified in *Waller.* (*Id.* at pp. 384-385.) It held that "the closure of the courtroom doors to additional spectators during part of the prosecutor's arguments, being both temporary in duration and motivated by legitimate concerns to maintain security and prevent continuous interruptions of closing arguments, and not involving the exclusion of preexisting spectators, did not constitute a denial of defendant's public trial right." (*Id.* at p. 381.)

One of the cases cited in *Woodward* was *People v. Buck* (1941) 46 Cal.App.2d 558, which, like this case, concerned whether a defendant was deprived of his right to a public trial when the trial court closed the courtroom as the jury was being instructed. (*Id.* at p. 562.) The appellate court in *Buck* held the closure did not violate defendant's right to a public trial, stating: "It is apparent that the order was made for the convenience of the court and all others present, including the appellant. It was made to facilitate the instructing of the jury and to obviate the disturbance and distraction which is made by spectators entering or leaving while the court is giving its instructions. This seemingly was the view taken at the time by the appellant and his counsel for no complaint was made during the trial. The court did not order anyone to leave the courtroom. It merely attempted to keep the spectators from moving in or out during the period of instruction. In this particular instance it is to be observed that the court instructed the jury before the argument of counsel and that the doors of the courtroom were opened during the argument." (*Ibid.*)

20

Courts in other jurisdictions have also held that a courtroom closure during jury instructions did not violate the right to a public trial. In *State v. Brown* (Minn. 2012) 815 N.W.2d 609, a trial court in Minnesota ordered the courtroom locked for the duration of jury instructions. (*Id.* at p. 614.) The Minnesota Supreme Court held that the closure was " ' "trivial" ' " and did not violate defendant's right to a public trial. It reasoned: "While the trial court did lock the courtroom doors during jury instructions, the courtroom was never cleared of all spectators, and the judge in fact told the people in the courtroom that they were 'welcome to s[t]ay.' The trial remained open to the public and press already in the courtroom and the trial court never ordered the removal of any member of the public, the press, or the defendant's family. In addition, the jury instructions did not comprise a proportionately large portion of the trial proceedings. All of these circumstances, taken together, convince us that the trial court's conduct did not implicate [defendant's] right to a public trial." (*Id.* at pp. 617-618, fn. omitted.) The court in *United States v. Scott* (1st Cir. 2009) 564 F.3d 34, reached a similar conclusion. There, the district court closed the courtroom during jury instructions, "presumably to avoid distracting the jury during the 'lengthy' and complex charge." (*Id.* at p. 37.) The district court also invited members of the public to remain in the courtroom (at least some of whom did remain), and there was no evidence that any member of the public who sought entry into the courtroom was denied access. (*Id.* at p. 38.) Under these circumstances, the court held that "no closure occurred in this case." (*Ibid.*)

Consistent with those cases, we conclude that the closure in this case was "de minimis" and did not violate defendant's right to a public trial. (*People v. Woodward, supra*, 4 Cal.4th at p. 385.) The closure occurred while the jury was being instructed and lasted less than an hour, making it "temporary in duration." (*Id.* at p. 381.) There is no indication that the courtroom was closed at any other point during the trial, nor any indication that the trial court ordered the removal of any member of the public prior to instructing the jury and locking the courtroom.

Defendant argues that the de minimis principle is inapplicable to this case because the trial court, unlike the trial court in *Woodward*, did not state any reasons on the record

21

justifying its decision to lock the courtroom. Certainly, it would have been preferable for the trial court to provide a reason for locking the courtroom instead of merely stating it was the court's "policy." Nevertheless, we may presume that the trial court had a legitimate reason for locking the courtroom, namely, to avoid the risk that the jury would be distracted or interrupted. (Evid. Code, § 664.) Nothing in the record indicates that the trial court's "policy" was based on a different or improper purpose. We also note that other courts upholding a courtroom closure during jury instructions did so despite the trial court's failure to state on the record why it closed the courtroom. (*State v. Brown, supra*, 815 N.W.2d at p. 618 ["To facilitate appellate review in future cases, we conclude the better practice is for the trial court to expressly state on the record why the court is locking the courtroom doors."]; *United States v. Scott, supra*, 564 F.3d at p. 37 [presuming that district court closed courtroom to avoid distracting the jury].)

Defendant also argues that the de minimis principle does not apply here because there was no showing that members of the public were in the courtroom prior to it being locked. In fact, defendant argues, it is likely that no member of the public was in the courtroom during jury instructions because the instructions began shortly after the trial court commenced its morning session. This is pure speculation, but even if we assume that no members of the public attended this portion of defendant's trial, that fact alone cannot be the basis for determining whether the court erred by locking the courtroom during jury instructions.

Although the record before us does not support a finding that defendant's right to a public trial was violated, we do not condone the trial court's actions. Trial courts should not lock their courtrooms as a matter of course while instructing a jury. Such actions, even if not unconstitutional, may create the appearance that our courts are closed to the public. The better practice is to make an individualized determination in each case. If, after making an individualized determination, a trial court decides to lock its courtroom during jury instructions, it should announce its decision on the record in advance, provide specific reasons supporting its decision, and give the parties a chance to be heard.

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

We concur:

_____
Kline, P.J.

_____
Richman, J.

A134585, *People v. Valladares*

24